**Ex parte Nicholas Charles DeGRACE.**

**No. 24910.**

Kansas City Court of Appeals.

Missouri.

Feb. 12, 1968.

D. L. Manford, Bellemere & Bellemere, Kansas City, for relator.

Howard L. McFadden, L. Michael Lorch, Asst. Attys. Gen., Norman H. Anderson, Atty. Gen., Jefferson City, for respondent.

HOWARD, Presiding Judge.

## ORIGINAL PROCEEDING IN HABEAS CORPUS

This is an original proceeding in habeas corpus instituted on the petition of Elizabeth DeGrace, the natural mother of Nicholas Charles DeGrace, a minor under the age of seventeen years, seeking his release from the Missouri State Training School for Boys, Boonville, Missouri. Nicholas was committed to the training school on December 27, 1966, by the Juvenile Division of the Circuit Court of Clay County, Missouri.

In response to the mother's petition our writ duly issued and return was made, justifying custody on the basis of such commitment. Evidence was heard by this Court, briefs were filed by the respective parties and oral argument heard. Petitioner seeks the release of her son on the basis that his constitutional rights, both state and federal, were violated in the proceedings before the juvenile court leading up to his commitment. Petitioner relies almost entirely on the decision of the Supreme Court of the United States, May 15, 1967, in Application of Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527.

It is claimed that the juvenile court proceedings were unconstitutional in three respects: (1) Failure to give adequate and timely notice, (2) failure to advise the juvenile and his parents of their right to counsel, and (3) failure to advise of the privilege against self-incrimination.

At the habeas corpus hearing before this court a complete transcript of the juvenile proceedings was introduced in evidence. The proceedings in the juvenile court began on March 25, 1966, when the juvenile officer of Clay County, Missouri, filed a petition in juvenile court alleging that Nicholas Charles DeGrace is in need of the care and treatment of the court because he is alleged to have violated a state law or municipal ordinance, to-wit:

"That on or about March 19, 1966, in Clay County, Missouri, he and four other juveniles (3 boys and 1 girl) did drink alcoholic beverages and spend the entire night in a motel cabin; that on or about March 11, 1966, he drank alcoholic beverages; that he has been drinking alcoholic beverages for approximately a year; that he has been truant from school on several occasions, is out of the control of his parents and in need of the care and treatment of the Court."

Summons and copies of this petition were served on the parents on March 29, 1966. The hearing in juvenile court was set for April 15, 1966, but was continued to April 21, 1966 because of the illness of the juvenile. Nicholas was born September 23, 1952, so that he was 13 years of age at the time of this hearing and his 14th birthday would be September 23, 1966.

At the commencement of this hearing, the judge advised the juvenile and his parents that they were "entitled to be represented by a lawyer if you so desire." The judge further told them: "Well, this is entirely

your decision. It is up to you." When the judge asked "Do you wish to have an attorney represent you, Mr. and Mrs. De-Grace, and Nicholas?" the mother replied "No, your Honor, I think we can carry on without counsel" and the father said "I don't see what I am going to need a lawyer for." They then indicated that they were ready to proceed with the hearing.

Nicholas first came to the attention of the juvenile officers on September 28, 1965 (just after his 13th birthday) when he "was picked up for harrassing" a named individual at a trailer court. On December 12, 1965, he was referred to the juvenile office by his school for truancy; and again for truancy on March 2, 1966.

The next contact that Nicholas had with the juvenile court was the result of the petition filed on March 25, 1966 as heretofore quoted. At the hearing held on April 21, 1966, it developed that Nicholas along with four other juveniles (3 boys and 1 girl) bought some liquor from a man in Liberty. They gave him the money and he went to the liquor store and bought the liquor for the juveniles. They got beer, malt liquor, cherry vodka and other items. They drank these and ended up spending the night in a cabin of the motel owned by Nicholas' parents. Considerable damage was done to the cabin. Holes were punched in the ceiling, windows were broken, a bed torn up, etc. This cabin had been rented to a truck driver who could not be found and did not testify. It appears that Nicholas passed out about the time or soon after the group arrived at the cabin and that he did not cause any of the destruction.

When Nicholas did not return home, the mother and an older son instituted a search for him. The father was working that night. They apparently contacted the Liberty police, the Kansas City, Missouri, police and others in their search for Nicholas.

The evidence does not disclose exactly when or how Nicholas returned home.

When the damage to the cabin was discovered, it was reported to the Liberty Police Department and in the investigation of the damage Nicholas' shirt was found. The police and Mrs. DeGrace began to put 2 and 2 together and connected the juveniles with the damaged cabin which led to the discovery of what had happened that night.

It appears that this was the second time within a few days that Nicholas and other juveniles had secured liquor through this same adult. He was prosecuted in the magistrate court and sentenced to ten days in jail. He was in jail at the time of the hearing and did not testify. It also appeared that Nicholas had drunk beer and liquor a few other times. The evidence further disclosed that Nicholas' school work was very, very poor. At the conclusion of the hearing, the court found that on March 19, 1966, Nicholas, together with other juveniles did "drink alcoholic beverages and spent the entire night in a motel cabin owned and operated by his parents; that on March 11, 1966, he drank alcoholic beverages and has been drinking alcoholic beverages for about six months; that he has been truant from school and is out of the control of his parents". The court further found:

"That said child is in need of the care and treatment and is in need of training school education and discipline under the charge of the State Board of Training Schools because his behavior, environment and associations are injurious to his welfare and the welfare of others.

"That said child be granted probation; and that he is in need of the care and treatment of the court."

It is to be noted that the finding of the juvenile court as set out above would have justified and supported a commitment to the State Board of Training Schools. However, the court did not commit Nicholas at this time but placed him on probation and returned him to the home of his

parents. The order of the court reads as follows:

> "WHEREFORE, it is considered, ordered, adjudged and decreed by the court that said child be made a ward of this court until he reaches the age of eighteen years; placed in the care and custody of the juvenile officer and to be returned to the home of his parents under probation; all subject to the further order of the court."

Nicholas next appeared before the juvenile court on September 8, 1966. At this time he and his parents were represented by an attorney. A few days before this hearing Nicholas, with two other juveniles, had taken the car of the oldest juvenile's mother without her permission and run off to Oklahoma City where they were picked up by the police and returned to Clay County. Nicholas, although still not quite 14, had done a considerable amount of the driving on that trip. It appears that the boys planned the trip on Friday and left late Friday night. That Friday was the regular day Nicholas was supposed to report to the juvenile officer in connection with his probation. His mother called and reported that he was ill and unable to appear but he went to the picture show in Liberty that evening and left town after the show. At the hearing, the parents and their attorney advised the court that they had hopes of getting Nicholas into Boys Town, Nebraska. The court's order directed the juvenile officer to investigate the possibility of securing admission to Boys Town and Nicholas was remanded to his parents and continued on probation.

Apparently, the attempt to place Nicholas in Boys Town, Nebraska was unsuccessful because on the 23rd day of September, 1966, the court ordered Nicholas continued on probation and placed in the home of his paternal aunt and her husband, Anita and Ross Capps. That order reads as follows:

> "WHEREFORE, it is ordered and adjudged by the court that said Nicholas

Charles DeGrace, be continued on probation and placed in the home of the paternal aunt and uncle, Anita Capps and Ross Capps, 10414 East 39th Street Terrace, Kansas City, Missouri. It shall be a condition of his probation, among conditions, that said Nicholas Charles DeGrace not come to Clay County, Missouri unless accompanied by said aunt and uncle; all subject to the further order of the court."

Thereafter, on December 22, 1966, the juvenile officer advised the court that Nicholas could not be located and a pickup order was issued. A hearing on alleged violation of probation was held on December 27, 1966. At this hearing it appeared that Nicholas had not remained with his aunt and uncle as required by the condition of his probation. He had returned to Clay County in violation of such probation order and although he was just over 14 years of age, he had been driving a car which was involved in a wreck in Clay County, Missouri on Friday, December 17, 1966. At the time of the accident Nicholas and another young juvenile ran from the scene and were not present when the officer who investigated the accident arrived. Nicholas gave two conflicting statements concerning this wreck to the juvenile officer. First, he stated that he was not the driver, and later he stated he was the driver at the time of the wreck. At the hearing, he testified that he was not the driver of the automobile at the time of the wreck. Each of the three other boys that were in the car testified that Nicholas was the driver of the car at the time of the wreck. The evidence showed that Nicholas had been in Clay County and not accompanied by his aunt and uncle on numerous occasions; at times he came to Clay County with his older married sister.

At the habeas corpus hearing before this court, his mother testified that she brought Nicholas home from his aunt's house and drove him to school in Independence every day and to church on Sunday. She admitted that she did not advise the juvenile

court of this situation. At the conclusion of this hearing, the court made the following factual findings and ordered Nicholas committed to the State Training School for Boys, Boonville, Missouri. The finding and order read:

"That said child has violated the conditions of his probation by operating a motor vehicle and having an accident in Clay County, Missouri; by violating the court order in coming into Clay County, Missouri; not in the company of his uncle and aunt, Mr. and Mrs. Ross Capps, and by associating with boys of bad reputation; and that his probation be revoked.

"That said child is in need of care and treatment and is in need of training school education and discipline under the charge of the State Board of Training Schools because his behavior, environment and associations are injurious to his welfare and to the welfare of others.

"WHEREFORE, it is by the court considered, ordered, adjudged and decreed that said child be and is hereby declared in need of training school education and discipline and is accordingly committed to the custody of the State Board of Training Schools to be by them dealt with in all respect as required by law for an indeterminate period but no longer than the period until such child shall have attained the age of twenty-one. The sheriff of this County is required to take temporary custody of said child and to deliver him to the custody of the superintendent of the Training School for Boys, Boonville, Missouri, for and in behalf of said Board."

Thereafter, Notice of Appeal was filed appealing this order to the Kansas City Court of Appeals. Our records show that an application for release of Nicholas on bond was filed and denied by this court. This appeal was not perfected.

In this habeas corpus proceeding the argument in support of the claimed violation of constitutional rights goes to the factual situation surrounding the first hearing held April 17, 1966. Petitioner contends that the proceedings had in connection with that hearing were constitutionally defective and that, therefore, the commitment is void. At the time of the hearing of April 17, 1966, the court made findings which would have supported a commitment to the Training School for Boys but the court did not order such commitment. Rather, as heretofore stated, Nicholas was made a ward of the court until he reached 18. The court placed him on probation and remanded him to the custody of his parents. After the hearing of September 23, 1966, Nicholas was continued on probation and placed in the custody of his aunt and uncle. The evidence at this time showed a violation of his probation. It was not until the hearing of December 27, 1966 where the evidence again showed serious violation of probation and violations of law which would support commitment, independent of the parole violation, that the court committed Nicholas to the State Training School for Boys. Consequently, we cannot consider the issues raised in the light of the hearing of April 17 alone; rather we must consider petitioner's claim in the light of all of the proceedings heretofore outlined which must all be taken together to constitute the whole.

Since petitioner relies almost exclusively on the decision of the United States Supreme Court in the Application of Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527, a short statement of that case is in order. Gerald Francis Gault was a resident of Gila County, Arizona. On June 8, 1964, he and a friend were taken into custody by the sheriff as a result of a verbal complaint by a neighbor woman that she had received telephone calls "in which the caller or callers made lewd or indecent remarks." The juvenile officer filed a petition with the court on the following day. It was not served on the Gaults; it was neither given nor shown to Gerald or his parents. The petition was entirely formal. It

made no reference to any factual basis for the judicial action which it initiated. On this same day, the first of two hearings was held. No one was sworn at this hearing, no transcript or recording was made, no memorandum or record of the substance of the proceedings was prepared. Gerald was kept in a detention home from the time he was picked up on June 8th until he was released on either June 11th or 12th. There was no explanation in the record as to why he was kept in the detention home or why he was released. On the day Gerald was released, his mother received a note on plain paper signed by the last name of the juvenile officer advising that the judge had "set Monday June 15, 1964 at 11:00 A.M. as the date and time for further Hearings on Gerald's delinquency". No record was made of this second hearing at the conclusion of which the judge entered an order which recited that "after a full hearing and due deliberation the Court finds that said minor is a delinquent child, and that said minor is of the age of 15 years." Gerald was committed as a juvenlie delinquent to the State Industrial School "for the period of his minority". Habeas corpus was applied for by Gerald's parents and in the absence of a transcript of the proceedings in juvenile court, oral testimony was taken at the hearing on habeas corpus as to what proceedings were had and what evidence was heard in the hearing in juvenile court. This evidence was conflicting but the juvenile judge testified that his action in committing Gerald rested largely upon the fact that Gerald had admitted making some of the lewd remarks although not the more serious ones. This admission by Gerald was controverted by the testimony of other witnesses. At the juvenile hearing, neither Gerald nor his parents were advised of their right to counsel although his mother did testify that "she knew that she could have appeared with counsel at the juvenile hearing."

■ On appeal to the Supreme Court, the Gaults contended that the commitment of Gerald violated the provisions of the Due Process Clause of the Fourteenth Amendment of the United States Constitution and the specific rights given by the Fourth and Fifth Amendments. The court concluded that the Due Process Clause did apply to juvenile proceedings and that the requirements of the Bill of Rights were carried forward and became requirements as to state juvenile procedures by the Fourteenth Amendment. The court said: " * * * neither the Fourteenth Amendment nor the Bill of Rights is for adults alone." The court further stated: "Under our Constitution, the condition of being a boy does not justify a kangaroo court."

■ As to the matter of notice in the Gault case, there was no notice. The juvenile was arrested and detained before any petition was filed in court. The petition as filed did not contain any factual statement of the charge against the boy. Such petition was never served on or shown to the juvenile or his parents. The parents found out through their own investigation that Gerald was held at the detention home, and when the mother went to the home she was orally advised by the deputy probation officer who was the superintendent of the home that there would be a hearing at 3 o'clock on the following afternoon. As to the requirement of notice sufficient to satisfy due process, the Supreme Court said, 87 S.Ct. 1. c. 1446:

"* * * Notice, to comply with due process requirements, must be given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded, and it must 'set forth the alleged misconduct with particularity.' * * * Due process of law requires notice of the sort we have described—that is, notice which would be deemed constitutionally adequate in a civil or criminal proceeding. It does not allow a hearing to be held in which a youth's freedom and his parents' right to his custody are at stake without giving

them timely notice, in advance of the hearing, of the specific issues that they must meet. * * * "

In the case at bar, it appears that the notice specifically alleged the factual basis for the charge of Nicholas' delinquency; that it was filed on March 25, 1966 and served on the parents on March 29, 1966. The court order issued pursuant to this petition set the hearing initially for April 15, 1966 and, because of Nicholas' illness, the hearing was continued until April 21, 1966. Thus, it appears that 23 days elapsed between service of the notice and the date the hearing was held. We conclude that this amply complied with the requirements of due process as found in both state and federal constitutions, both as to timeliness of the notice and its contents.

Petitioner next contends that the proceedings were in violation of the state and federal constitutions because neither the juvenile nor his parents were advised of their right to counsel. At the habeas corpus hearing before this court, the mother testified that she asked the juvenile officer if she should hire a lawyer and that the juvenile officer advised her that a lawyer would not do any good. It is argued that this incident rendered the action of the juvenile judge at the hearing on the matter of representation by attorney a mere formality and robbed such proceedings of any substances. With this we cannot agree. It will be remembered that at the very outset of the hearing, the juvenile judge advised Nicholas and his parents that they were entitled to be represented by a lawyer if they so desired and that representation or no representation was entirely their decision. The court specifically inquired if they desired to be represented by counsel and the mother and father both separately stated that they did not desire counsel. Thus, it cannot be said that their constitutional rights were denied. Regardless of the statement of the juvenile officer, the decision as to whether or not they should

retain an attorney was one to be made by the parties and not by the juvenile officer. The court clearly advised them in the premises and they made their own decision as to the efficacy of counsel under the circumstances. They knew their rights and they knowingly waived them.

The record shows that at the second hearing of September 8, 1966, Nicholas and his parents were represented by counsel of their own choosing. At the third and last hearing on December 27, 1966, Nicholas and his parents were represented by a different lawyer of their own choice. After the appeal was filed an application for release on bond was presented to this court by still a third attorney representing Nicholas and his parents. This habeas corpus proceeding has been initiated by a fourth attorney and at the hearing before this court, the mother testified that she had consulted still other attorneys.

Lastly, petitioner complains that the juvenile officer took statements from Nicholas without advising him of his right to counsel or of his privilege against self-incrimination and that Nicholas was asked and answered questions in court without being advised of his privilege against self-incrimination. Petitioner contends that the action of the court was not based on other evidence but was based solely on the testimony of the minor.

These juvenile proceedings were conducted in chambers in an informal manner. The mother testified at the habeas corpus hearing that when the juvenile officer asked Nicholas to come into her office she told him to go in and tell the truth. At the hearing before the juvenile court, she stated that she was proud of Nicholas because he had told the truth. No suggestion was made at the hearing that Nicholas should not testify and both parents made factual statements at the hearing concerning the actions of Nicholas.

While the testimony of Nicholas filled out the details as to the procuring of the

alcoholic beverages, the drinking of the same and staying all night in the cabin, the essential facts were established by the testimony of others. In the second hearing, Nicholas again testified as to some of the details of the running-away trip to Oklahoma City, but there was other evidence. In both of these hearings, the statements of both the court and the parents show that there was in fact no contest that Nicholas had done what he was charged with and the only issue to be considered was what should be done with Nicholas in light of such facts. In the third and final hearing, Nicholas denied having been the driver of the car at the time of the wreck but he did admit being in Clay County not in the company of his aunt and uncle in violation of the probation order and associating with certain individuals, also in violation of such order. The testimony of the mother before this court shows a continued pattern of violation of the probation order and its requirement that Nicholas come to Clay County only in the company of his aunt and uncle and that such violation was with her knowledge and assistance. The facts of Nicholas' presence in Clay County and operation of the automobile at the time of the wreck were clearly established by the testimony of independent witnesses with personal knowledge thereof.

█ As to self-incrimination, the Supreme Court in its opinion in Application of Gault, supra, emphasized that "The Juvenile Court Judge testified at the habeas corpus hearing that he had proceeded on the basis of Gerald's admission at the two hearings." The court pointed out that "Neither Gerald nor his parents was advised that he did not have to testify or make a statement, or that an incriminating statement might result in his commitment as a 'delinquent' ". As to the applicability of the constitutional privilege against self-incrimination, the court said: "We conclude that the constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults." The court reiterated that the judgment of the juvenile court was based on Gerald's admissions and concluded that "Apart from the 'admission,' there was nothing upon which a judgment or finding might be based. There was no sworn testimony" at the Gault hearings. The court concluded that the juvenile proceedings were constitutionally invalid because of the failure to advise Gerald of his privilege against self-incrimination and because the judgment of the court was based only upon such improperly received evidence.

█ In the case at bar, the action of the juvenile court in placing Nicholas on probation on two different occasions and finally in committing him to the Training School is amply supported by evidence independent of the admissions and testimony of Nicholas. It is this commitment to the Training School which is sought to be set aside by this habeas corpus proceeding.

On the basis of the foregoing, we conclude that the proceedings in the juvenile court of Clay County, Missouri which resulted in the commitment of Nicholas Charles DeGrace to the State Training School at Boonville, Missouri, were not constitutionally defective as claimed by petitioner and that our writ heretofore issued should be and the same is hereby quashed.

CROSS, J., concurs.

MORGAN, J., not participating because not a member of the Court when the case was submitted.